# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50641

United States Court of Appeals
Fifth Circuit

**FILED**
August 16, 2018

Lyle W. Cayce
Clerk

DOCTOR JENNIFER LYNN GLASS; DOCTOR LISA MOORE; DOCTOR MIA CARTER,

> Plaintiffs - Appellants

v.

KEN PAXTON, in his official capacity as Attorney General of Texas; GREGORY L. FENVES, in his official capacity as President, University of Texas; PAUL L. FOSTER, JR., in his official capacity as a member of the University of Texas Board of Regents; R. STEVEN HICKS, in his official capacity as a member of the University of Texas Board of Regents; JEFFREY D. HILDEBRAND, in his official capacity as a member of the University of Texas Board of Regents; ERNEST ALISEDA, in his official capacity as a member of the University of Texas Board of Regents; DAVID J. BECK, in his official capacity as a member of the University of Texas Board of Regents; ALEX M. CRANBERG, in his official capacity as a member of the University of Texas Board of Regents; WALLACE L. HALL, JR., in his official capacity as a member of the University of Texas Board of Regents; BRENDA PEJOVICH, in her official capacity as a member of the University of Texas Board of Regents; SARA MARTINEZ TUCKER, in her official capacity as a member of the University of Texas Board of Regents,

> Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before KING, SOUTHWICK, and HO, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

No. 17-50641

Three professors from the University of Texas at Austin challenged a Texas law permitting the concealed carry of handguns on campus and a corresponding University policy prohibiting professors from banning such weapons in their classrooms. The professors argued that the law and policy violate the First Amendment, Second Amendment, and Equal Protection Clause of the Fourteenth Amendment. The district court dismissed the claims. We AFFIRM.

FACTUAL AND PROCEDURAL BACKGROUND

In 2015, Texas enacted Senate Bill 11, which permits certain license holders to concealed-carry handguns on college campuses. Tex. S.B. 11, 84th Leg., R.S. (2015) (codified as TEX. GOV'T CODE § 411.2031 (West 2017)) ("Campus Carry Law"). Under the law, public colleges may reasonably regulate carrying concealed handguns on campus, but the regulations may not have the effect of generally prohibiting the exercise of that right. § 411.2031(d-1). For example, the law permits public colleges to establish regulations concerning the storage of handguns in residence halls. § 411.2031(d).

The law applies only to concealed-carry license holders. § 411.2031(b). To become a license holder (with some exceptions), the applicant must be a Texas resident who is at least 21 years old, has not been convicted of a felony or certain misdemeanors, is not chemically dependent, has participated in handgun training, and has passed a proficiency examination. *See* §§ 411.172, 411.174, 411.188.

As a prerequisite to instituting campus concealed-carry regulations, colleges must first consult "with students, staff, and faculty of the institution regarding the nature of the student population, specific safety considerations, and the uniqueness of the campus environment." § 411.2031(d-1). Following enactment of the Campus Carry Law in 2015, the University of Texas at Austin

## No. 17-50641

(the "University") established a working group consisting of students, alumni, staff, and faculty tasked with recommending rules and regulations for concealed carry on campus. The working group received thousands of comments from the public via an online survey, meetings, and public fora.

The working group's final report made numerous recommendations to University President Gregory Fenves, who accepted the recommendations in a policy document entitled "Campus Carry Policies and Implementation Strategies." On the subject of concealed carry inside classrooms, the working group summarized comments received from people representing two opposing viewpoints. Those in opposition argued that the possible presence of concealed handguns in classrooms would "have a substantial chilling effect on class discussion." Supporters of the Campus Carry Law countered that such fears are unfounded, citing data "from the Texas Department of Public Safety establishing that license holders, as a group, are extremely law-abiding." Sympathizing with the concerns about chilled speech, the working group nonetheless recommended against banning concealed carry inside classrooms because such a regulation would likely violate the Campus Carry Law by effectively prohibiting concealed carry for those traveling to campus to attend class.

The Board of Regents incorporated all but one of the President's new policies into the University's operating procedures.[1] Staff and faculty must abide by the University's policy of permitting concealed carry in classrooms. Texas concedes that any University professor who attempts to ban concealed carry inside a classroom would be subject to disciplinary action for failing to abide by University policies.

---

[1] The Board eliminated the policy that prohibited license holders from keeping a live-round loaded in the chamber of their handguns while on campus.

3

No. 17-50641

In July 2016, Dr. Jennifer Glass and two other University professors[2] filed suit in the Western District of Texas, seeking declaratory relief on the constitutionality of the Campus Carry Law and injunctive relief against enforcement of the law and University policy. Glass raised three claims. First, she argued that the law and policy violate her First Amendment right to academic freedom by chilling her speech inside the classroom. Next, she argued that the law and policy violate her rights under the Second Amendment because firearm usage in her presence is not sufficiently "well-regulated." Finally, she argued that the law and policy violate her right to equal protection because the University lacks a rational basis for determining where students can or cannot concealed-carry handguns on campus.

Texas moved to dismiss the claims for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and, in the alternative, for failure to state a claim under Rule 12(b)(6). In July 2017, the district court dismissed Glass's claims without prejudice. In doing so, however, the district court provided analysis only for its dismissal of Glass's First Amendment claim under Rule 12(b)(1). Glass timely appealed.

## DISCUSSION

Glass raises two issues on appeal. First, she challenges the district court's holding that she lacks standing to raise her First Amendment claim. Second, she argues that because the district court failed to provide any reasoning for the dismissal of her Second and Fourteenth Amendment claims, the panel should reverse and remand for the district court to consider the merits of those two claims.

---

[2] Dr. Glass is a Liberal Arts professor in the Department of Sociology and Population Research. Dr. Lisa Moore is a professor of English. Dr. Mia Carter is also a professor of English. For simplicity, we will refer only to Glass.

### I. First Amendment

We start by examining Glass's First Amendment claim. She argues that the district court erred when it held that she lacks standing to challenge the Campus Carry Law and University policy on First Amendment grounds.

We review a district court's "dismissal for lack of standing *de novo*." *Moore v. Bryant*, 853 F.3d 245, 248 (5th Cir. 2017). Under the Constitution, one element of Article III's "Cases" and "Controversies" requirement is that a plaintiff must establish standing to sue. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted) (brackets in original). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). An injury must be "concrete, particularized, and actual or imminent." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

We know that "standing cannot be conferred by a self-inflicted injury." *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018). In the context of the First Amendment, however, "government action that chills protected speech without prohibiting it can give rise to a constitutionally cognizable injury." *Id.* at 391. Such governmental action may therefore "be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 12–13 (1972).

Glass in the amended complaint argued her classroom speech would be "dampened to some degree by the fear" it could initiate gun violence in the class by students who have "one or more handguns hidden but at the ready if the gun owner is moved to anger and impulsive action." In an affidavit she

expressed particular concern for "religiously conservative students [who] have extreme views," as well as "openly libertarian students," whom she "suspect[s] are more likely to own guns given their distaste for government."

The district court held that Glass and her fellow professors alleged "standing based on their self-imposed censoring of classroom discussion caused by their fear of the possibility of illegal activity by persons not joined in this lawsuit."   Glass lacked standing because she alleged a "subjective" First Amendment chill that was contrary to the presumption her students "will conduct their activities within the law and so avoid prosecution and conviction."  *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974).

Before analyzing the parties' arguments on appeal, it is helpful to begin with a summary of how the Supreme Court came to recognize the concept of a "subjective chill."   In *Tatum*, the plaintiffs challenged an Army surveillance program authorized to gather intelligence about potential domestic civil unrest by sending agents to attend public meetings throughout the country.  408 U.S. at 6.  They argued that "the very existence of the Army's data-gathering system produce[d] a constitutionally impermissible chilling effect upon the exercise of their First Amendment rights."  *Id.* at 13.  The "precise connection" between the challenged program and the alleged chill  was "somewhat unclear;" the Court held a number of arguments would be improper, including relying on "speculative apprehensiveness that the Army may at some future date misuse the information in some way that would cause direct harm" to the plaintiffs. *Id.* at 13 & n.7.  To the extent the *Tatum* plaintiffs had decided to self-censor their speech based on such speculation, any allegation of a chilling effect was "subjective" in nature.  *Id.* at 13–14.  "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Id.*

No. 17-50641

In *Amnesty International*, various lawyers and journalists challenged a provision of the Foreign Intelligence Surveillance Act allowing for the surveillance of certain foreign individuals. 568 U.S. at 406. The plaintiffs argued that their speech was chilled because they desired to communicate with likely targeted persons but would now decline to do so given the likelihood of government surveillance of their conversations. *Id.* at 406–07. First, the Court rejected the circuit court's application of a test asking whether there was an "objectively reasonable likelihood" of the plaintiffs' communications being intercepted in the future. *Id.* at 410. Such a standard fell short of the "requirement that 'threatened injury must be certainly impending.'" *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). The plaintiffs' theory about future interception of their communications relied on a highly speculative and "attenuated chain of possibilities" partially based on "the decisions of independent actors." *See id.* at 410–14. Parties "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 416.

Under the "certainly impending" standard, the Court held that the plaintiffs "set forth no specific facts demonstrating that the communications of their foreign contacts *will* be targeted." *Id.* at 412 (emphasis added). Whether or not the plaintiffs' communications would be surveilled rested on a "chain of contingencies," some of which were dependent on the discretion or decisions of independent actors. *Id.* at 410. The Government had multiple statutorily-authorized surveillance methods available for use against the foreign contacts — the plaintiffs assumed that the Government would choose the challenged provision as the method of surveillance in each instance. *See id.* at 412–13. Additionally, the plaintiffs could "only speculate as to whether [the Foreign Intelligence Surveillance Court would] authorize such surveillance." *Id.* at 413. In discussing this chain of contingencies, the Court reiterated its usual

7

"reluctan[ce] to endorse standing theories that require guesswork as to how independent decision makers will exercise their judgment." *Id.* Therefore, demonstrating that only a single link in a chain of contingencies was certainly impending did not "satisfy the requirement that any injury in fact must be fairly traceable to" the challenged government action. *Id.* at 411.

From the outset, it is therefore critical that we identify the harm serving as the catalyst for Glass's self-censorship. If her allegation of harm involves a "chain of contingencies" as in *Amnesty International*, then we must follow the Court's approach and identify each contingency prompting the self-censorship. *See id.* at 410–14. Each link in the chain of contingencies must be "certainly impending" to confer standing. *See id.*

Glass first argues that there is no question of injury here because the University will certainly discipline her if she bans concealed carry in her classroom. Given Texas's concession that consequences would follow if she were to ban concealed carry, Glass argues that the inquiry is complete because harm is certainly impending. Thus, the singular harm at issue is the University policy. *Tatum* and *Amnesty International*, she argues, are distinguishable because whether those respective plaintiffs' speech would be surveilled was purely speculative.

Texas counters that Glass has only alleged certainty about a single link at the end of a chain of contingencies similar to the plaintiffs in *Amnesty International*. Notwithstanding likely future disciplinary action, Glass is ultimately deciding to self-censor her speech based on the hypothetical future decisions of students in her classroom. Regardless of the likelihood of her being disciplined for banning concealed carry, her decision to self-censor her speech rests on a harm that is not certainly impending.

By arguing that the harm here is certain based on the University policy alone, Glass essentially argues that there is no chain of contingencies giving

rise to her self-censorship.  Her own description of how she came to self-censor her speech, however, reveals that there is indeed a chain of contingencies causing her alleged injury.  In her amended complaint, Glass describes her decision to self-censor as an "inevitable" response to the possibility that a "student has the present wherewithal for violent classroom action with a gun." She argues robust classroom debate "inevitably will be dampened to some degree by the fear that it could expose other students or [herself] to gun violence [and] by the professor's awareness that one or more students has one or more handguns hidden but at the ready if the gun owner is moved to anger and impulsive action."  Her self-censorship admittedly arises from her fears about the behavior of students who are concealed-carrying firearms in class. In other words, Glass's fear of potential violent acts by firearm-carrying students prompts her to self-censor by avoiding topics she worries might incite such violence or intimidation, which would be unnecessary but for the law and policy that prevent her from banning firearms in her classroom.

Glass's allegation of harm contains at least two contingences: (1) harm from concealed-carrying students incited by classroom debate and (2) harm from University disciplinary action.  Each contingency must be "certainly impending." *See id.*  The parties agree that disciplinary action would follow an attempt to ban concealed carry in her classroom.  Whether Glass has standing therefore turns on whether the alleged harm threatened by concealed-carrying students is "certainly impending."

Texas analogizes to the layers of speculation in *Amnesty International*, arguing that Glass's fear of harm rests on the assumption students with concealed-carry licenses, as independent decision-makers, are virtually certain to illegally use their firearms to intimidate, threaten, or commit violence in response to controversial classroom discussion.  Glass argues that her fears are neither speculative nor subjective.  She challenges the district court's

conclusion that she failed to present concrete evidence to substantiate her fears about students.  First, she cites to a "broader community of views" which believes that the presence of guns in the classroom will chill professors' speech. This community of views includes multiple University faculty members and multiple national educational organizations.  Second, she cites to various academic studies discussing a so-called "weapons effect."  According to Glass, "[t]hese studies conclude that the hidden presence of guns does threaten disruption of classroom activities, increases the likelihood that violence will erupt in the classroom, and intimidates non-carrying students — and undoubtedly professors, too."

The problem with Glass's argument is that none of the cited evidence alleges a certainty that a license-holder will illegally brandish a firearm in a classroom.  Elaborating on the academic studies, for example, the amici American Association of University Professors and the Giffords and Brady Centers to Prevent Gun Violence argue that the "weapons effect" demonstrates "the tendency of provoked individuals to behave aggressively when in the presence of actual guns," meaning that "carrying a concealed weapon can increase aggressive behavior by the person carrying."  Even assuming the validity of the weapons effect, however, a tendency toward increased aggression falls short of certainly impending aggression.  Ultimately, whether concealed-carrying students pose certain harm to Glass turns on their independent decision-making.  Because she fails to allege certainty as to how these students will exercise their future judgment, the alleged harm is not certainly impending.

Glass objects to a plain application of the "certainly impending" standard from *Amnesty International*, arguing that it sets the bar impossibly high. Instead, she asks us to confer standing on the basis that her fears are "objectively understandable and reasonable."  We cannot adopt this standard

because it was already rejected in *Amnesty International*. There, the Court rejected the Second Circuit's holding that the plaintiffs had standing because their injury was not "fanciful, paranoid, or otherwise unreasonable." *Id.* at 416. Such a standard, the Court held, "improperly waters down the fundamental requirements of Article III." *Id.* Parties' "contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing — because the harm they seek to avoid is not certainly impending." *Id.*

Contrary to Glass's argument, *Amnesty International* reiterated that standing is not impossible in every instance in which independent decision-making comes into play. An example of the Court's willingness to depart from its "usual reluctance" was *Meese v. Keene*, 481 U.S. 465 (1987). In *Keene*, the plaintiff, a California State Senator, argued that the Department of Justice's decision to label three films as "political propaganda" violated the First Amendment. 481 U.S. at 467. Under the Foreign Agents Registration Act of 1938, the Department of Justice labeled three Canadian documentaries as "political propaganda" because they could be "reasonably adapted" to "influence the foreign policies of the United States." *Id.* at 470. In order to exhibit the films in public, the State Senator was required to provide a copy of the material to the Attorney General along with a report "describing the extent of the dissemination." *Id.* In addition, he was required to disclose that by showing the films, he was acting as the agent of a foreign principal. *Id.* at 470–71 & n.6.

The Court began by noting that "[i]f Keene had merely alleged that the appellation deterred him by exercising a chilling effect on the exercise of his First Amendment rights, he would not have standing to seek its invalidation." *Id.* at 473. Instead, Keene alleged that the future reputational harm prompting his self-censorship was certain, and not merely possible. *See id.* In

No. 17-50641

support, he provided detailed affidavits citing public opinion polls showing that approximately one in two voters would be less inclined to vote for a candidate who showed a foreign film labeled as political propaganda by the Department of Justice. *Id.* & n.7.

Glass analogizes to *Keene* by arguing that the same rationale confers standing here. She misreads *Keene*. Although Keene's allegation of harm involved the contingency of individual voter decisions, he nonetheless alleged *certainty* about voter decision-making based on supporting affidavits and opinion polling. *See id.* at 473. Indeed, he alleged that "if he were to exhibit the films while they bore such characterization, his personal, political, and professional reputation *would* suffer and his ability to obtain re-election and to practice his profession *would* be impaired." *Id.* (emphasis added) (citation omitted). By contrast, Glass alleges *reasonable probability* of future harm from concealed-carrying students. According to her, she is "faced with the knowledge that there is a reasonable probability that sitting at one of the desks in [her] enclosed classroom is a young student" who believes that a "gun can be used when the appropriate circumstances present themselves."

Glass further argues that a denial of standing would improperly fail to construe the factual allegations of her complaint in her favor. *See Lujan*, 504 U.S. at 561. Her argument is misplaced for the same reason that *Keene* is distinguishable. The issue here does not concern the weight given to her factual allegations, but rather the absence of any allegation of certainty about the students' future decisions. Keene alleged certainty about the voters' future decisions based on polling, which empowered him to allege certainty about future reputational harm. *Keene*, 481 U.S. at 473. Construing the factual allegations of Glass's complaint in her favor, she nonetheless fails to allege what is required under *Amnesty International*. The requirement is that harm from concealed-carrying students be certainly impending.

12

The same concerns fueling the Court's "usual reluctance" in *Amnesty International* are present here. Although Glass's claim centers on the First Amendment, her standing arguments invoke notable separation of powers concerns. By adjudicating claims for which the alleged harm is not certainly impending, federal courts risk disregarding their constitutional mandate to limit their jurisdiction to actual cases and controversies and thereby avoid the issuance of advisory opinions.

Glass cannot manufacture standing by self-censoring her speech based on what she alleges to be a reasonable probability that concealed-carry license holders will intimidate professors and students in the classroom. The district court did not err. Glass lacks standing to bring her First Amendment claim.

## II.    *Second and Fourteenth Amendment claims*

In her amended complaint, Glass raised three claims challenging the Campus Carry Law and University policy. As we just discussed, Texas moved to dismiss Glass's First Amendment claim for lack of standing under Rule 12(b)(1). Texas also moved to dismiss the Second and Fourteenth Amendment claims for failure to state a claim under Rule 12(b)(6). The district court dismissed all three claims without prejudice but only provided analysis for its dismissal of her First Amendment claim under Rule 12(b)(1). Glass argues we should reverse and remand the dismissal of her Second and Fourteenth Amendment claims for the district court to consider. Texas argues we should reach those issues and affirm their dismissal. We therefore analyze whether we should reach Glass's remaining claims on appeal.

Glass relies on precedent stating that "[i]t is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). At the same time, "[t]he matter of what questions may be taken up and resolved for the first time on

appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Id.* at 121.  Although the Supreme Court has declined to state a general rule as to how appellate courts should exercise their discretion, "there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt . . . or where 'injustice might otherwise result.'" *Id.* (quoting *Hormel v. Helvering*, 312 U.S. 552, 557 (1941)).  When the only remaining issues are purely legal questions that were briefed below, we have been willing to resolve those issues on appeal to avoid a waste of judicial resources.  *See Halbert v. City of Sherman*, 33 F.3d 526, 530 (5th Cir. 1994).

Glass describes our traditional approach as categorically rigid, citing to a case where we declined to "consider an issue passed over by the district court" absent special circumstances.  *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 483 (5th Cir. 2006).  That opinion is not a blanket prohibition.  The new issue there concerned an unaddressed cross-motion for summary judgment, meaning the district court had not "considered any of [the movant's] arguments with the burdens and presumptions favoring . . . the nonmovant." *Id.*  Regardless, *Man Roland's* meaning must be analyzed consistently with preexisiting precedential rulings such as *Halbert*, in which we recognized our option to consider purely legal issues for the first time on appeal.  *See* 33 F.3d at 530.  Here, Glass's remaining claims present purely legal questions that were briefed to the district court.  In stewardship of judicial resources, we exercise our discretion to reach all of Glass's claims.

We review *de novo* the legal question of whether Glass's allegations state a constitutional claim.  *See Caine v. Hardy*, 943 F.2d 1406, 1415 (5th Cir. 1991) (en banc).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* We turn now to Glass's Second Amendment claim.

### a. Second Amendment

Glass argues that the Campus Carry Law and University policy violate the Second Amendment because firearm usage in her presence is not sufficiently "well regulated." The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The Court also held that "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (citation omitted) (emphasis in original).

Glass contends that to the extent the Second Amendment recognizes an individual right to carry firearms, persons not carrying arms have a right to the practice being well-regulated. Glass's argument collapses the distinction between the Amendment's two clauses: the militia-focused prefatory clause and the operative clause. In *Heller*, the Court relied on text, history, and tradition to interpret the prefatory clause as "announc[ing] the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 599. Codification of the right occurs in the operative clause. *Id.* at 579. Notwithstanding this distinction, Glass advocates an "independent meaning"

of the prefatory clause which recognizes "a constitutional right not to have the government force [individuals] into allowing guns in their professional presence as a condition of public employment unless gun possession and use are 'well-regulated.'"    "Like it or not," Glass argues, "there *is* specific constitutional language that premises the right, whatever its extent, on the use of guns [as] 'well-regulated.'"  She argues that the prefatory clause places a "condition" on the individual right.

Her "admittedly fresh" take on the Second Amendment therefore turns on the proper interpretation of the Amendment's prefatory clause.  In support, Glass cites to a line in *Heller* where the Court interpreted "well-regulated" as "the imposition of proper discipline and training."  554 U.S. at 597.  She further relies on one of our opinions where we stated that "gun use and gun control have been inextricably intertwined" such that "an expectation of sensible gun safety regulation was woven into the tapestry of the [Second Amendment] guarantee."  *National Rifle Ass'n v. BATFE*, 700 F.3d 185, 200 (5th Cir. 2012).

Glass's argument is foreclosed by *Heller*.  In two separate locations in the majority opinion, the Court held that the Second Amendment's prefatory clause does not limit its operative clause: "The [prefatory clause] does not limit the [operative clause] grammatically, but rather announces a purpose." 554 U.S. at 577.  Indeed, the "prefatory clause does not limit or expand the scope of the operative clause." *Id*. at 578.  The Amendment's first clause "is prefatory and not a limitation on the amendment itself."  *Hollis v. Lynch*, 827 F.3d 436, 444 (5th Cir. 2016).  Because the operative clause provides the codification of the individual right, the prefatory clause cannot "limit or expand the scope" of the individual right.  *Heller*, 554 U.S. at 578.

The prefatory clause does not limit the scope of the individual right codified in the operative clause.  She has failed to state a claim under the Second Amendment.

*b. Equal protection*

Finally, Glass argues that the Campus Carry Law and University policy violate her right to equal protection under the Fourteenth Amendment because the University lacks a rational basis for determining where students can or cannot concealed-carry handguns on campus.

"The equal protection clause essentially requires that all persons similarly situated be treated alike." *Mahone v. Addicks Util. Dist.of Harris Cnty.*, 836 F.2d 921, 932 (5th Cir. 1988). The parties do not dispute that rational basis review applies because the professors are not members of a protected class nor does the alleged classification infringe a fundamental constitutional right. *See Hines v. Alldredge*, 783 F.3d 197, 202 (5th Cir. 2015). Under this standard, a legislative classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Parties attacking the presumption of validity extended to legislative classifications "have the burden 'to negative every conceivable basis which might support it.'" *Id.* at 315 (citation omitted).

When applying rational basis doctrine to a dismissal for failure to state a claim, a legislative classification must be treated as valid "if a court is able to hypothesize a legitimate purpose to support the action." *Mahone*, 836 F.2d at 934. "[T]he task of hypothesizing necessarily renders less important the actual reasons which the state may have had for making the challenged classification." *Id.* at 936. "[W]hen truth is not the issue, we can understand how using discovery procedures to develop facts showing the state's true reason for its actions could be, for all practical purposes, both inefficient and unnecessary." *Id.* Accordingly, "in some cases it makes sense to use a motion to dismiss as the vehicle through which to address the viability of the [equal

protection] claim." *Id.* This is especially true when "'it takes but momentary reflection' to arrive at a purpose that is both legitimate beyond dispute and rationally related to the state's classification." *Id.* (quoting *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 74 (1978)).

In her amended complaint, Glass alleges that "[t]here is no rational basis for the division in the state's policies between where concealed carry of handguns is permitted and where it may be prohibited." She does not challenge Texas's purported government interest: public safety and self-defense. Instead, she argues that there is no rational basis for Texas to allow private universities to ban concealed carry but not public universities. In addition, she argues that there is no rational basis for the University to allow concealed carry in classrooms while simultaneously prohibiting the practice in other campus locations such as faculty offices, research laboratories, and residence halls.

Texas argues that simple explanations provide the needed rational basis. First, the Campus Carry Law distinguishes between public and private universities in order to respect the property rights of private universities. Second, public safety and self-defense cannot be achieved if concealed carry is banned in classrooms because attending class is a core reason for students to travel to campus. Texas argues that public safety and self-defense can still be achieved if concealed carry is banned in less-frequented areas such as faculty offices and research laboratories.

Glass ultimately fails to address Texas's arguments concerning rational basis. Instead she simply argues that the prohibited concealed-carry zones are an "inexplicable hodge-podge." She argues that a single sentence from our precedent requires us to allow her claim to proceed to discovery to present the evidence necessary to fulfil her burden. There, we stated that "although rational basis review places no affirmative evidentiary burden on the

government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013). We made that statement in response to a state's purported rational basis that rose to the level of "fantasy." *Id.* Louisiana enacted a law prohibiting the sale of caskets to anyone except funeral directors. *Id.* at 226. The law was irrational: "Louisiana does not even require a casket for burial, does not impose requirements for their construction or design, does not require a casket to be sealed before burial, and does not require funeral directors to have any special expertise in caskets." *Id.* Accordingly, the panel could not conceive of a single rational basis connecting public health and the state law. *Id.*

The Supreme Court has held that when conceiving of hypothetical rationales for a law, the assumptions underlying those rationales may be erroneous so long as they are "arguable." *Beach Commc'ns*, 508 U.S. at 320. Here, Texas's rationales are arguable at the very least. Glass fails to meet her burden requiring that she "negative every conceivable basis which might support" Texas's purported rational basis. *Id.* at 315 (citation omitted).

AFFIRMED.