# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 2, 2020

Lyle W. Cayce
Clerk

No. 19-40605

RONALD S. HINES, DOCTOR OF VETERINARY MEDICINE,

*Plaintiff—Appellant*,

*versus*

JESSICA QUILLIVAN, DOCTOR OF VETERINARY MEDICINE, IN HER OFFICIAL CAPACITY AS PRESIDENT OF THE TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS; KEITH PARDUE, IN HIS OFFICIAL CAPACITY AS VICE PRESIDENT OF THE TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS; SANDRA "LYNN" CRINER, DOCTOR OF VETERINARY MEDICINE, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS; MICHAEL WHITE, DOCTOR OF VETERINARY MEDICINE, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS; SAMANTHA MIXON, DOCTOR OF VETERINARY MEDICINE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS; RANDALL SKAGGS, DOCTOR OF VETERINARY MEDICINE, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS; CARLOS CHACON, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS; SUE ALLEN, LICENSED VETERINARY TECHNICIAN, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS; GEORGE ANTUNA, IN HIS OFFICIAL

No. 19-40605

capacity as a Member of the Texas State Board of Veterinary Medical Examiners,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CV-155

---

Before Elrod, Southwick, and Haynes, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

Does a veterinarian have a right to engage in telemedicine for a pet he has not physically examined?  The plaintiff claims that right exists.  He filed suit, challenging Texas's physical-examination requirement for vets, which prohibits vets from offering individualized advice to pet owners unless the vet previously examined the animal.  In 2015, we rejected the plaintiff's claims under the First Amendment and Equal Protection Clause.  Now, he claims that new precedent from the Supreme Court and this circuit dictate a different result.  The plaintiff filed suit again in 2018, re-raising his First Amendment claims.  He also added a new equal-protection claim based on Texas's different telemedicine rules for physicians and veterinarians.  The district court rejected the plaintiff's arguments and granted the defendants' motion to dismiss.  We AFFIRM in part, REVERSE in part, and REMAND.

FACTUAL AND PROCEDURAL BACKGROUND

Dr. Ronald Hines, a licensed veterinarian in Texas, stopped practicing what might be called traditional veterinary medicine in 2002 due to his age

and physical limitations. Soon thereafter, he began using his website to write articles about pet health. People around the world began emailing Hines for advice about their own pets. Hines offered individualized advice over email and phone, and in 2003, he added to his website a flat fee for veterinary advice.

Under Texas law, the "[p]ractice of veterinary medicine" is defined as:

> (A) the diagnosis, treatment, correction, change, manipulation, relief, or prevention of animal disease, deformity, defect, injury, or other physical condition, including the prescription or administration of a drug, biologic, anesthetic, apparatus, or other therapeutic or diagnostic substance or technique;
>
> (B) the representation of an ability and willingness to perform an act listed in Paragraph (A);
>
> (C) the use of a title, a word, or letters to induce the belief that a person is legally authorized and qualified to perform an act listed in Paragraph (A); or
>
> (D) the receipt of compensation for performing an act listed in Paragraph (A).

TEX. OCC. CODE § 801.002(5). To practice lawfully, the veterinarian must have "sufficient knowledge of the animal," which is defined as either having recently examined the animal or having visited the "premises on which the animal is kept." § 801.351(b). "A veterinarian-client-patient relationship may not be established solely by telephone or electronic means." § 801.351(c). Violations of these limitations are criminal offenses. § 801.504.

No. 19-40605

In 2012, the Texas State Board of Veterinary Medical Examiners investigated Hines and found he had violated state law. The Board ordered him to cease providing veterinary advice electronically without physically examining the animal.

In 2013, Hines filed suit against the Board members in the United States District Court for the Southern District of Texas. He argued that Texas's physical-examination requirement violated his First Amendment, equal-protection, and substantive-due-process rights. The defendants filed a Rule 12(b)(6) motion to dismiss, which the district court granted in part. *Hines v. Alldredge*, No. 1:13-CV-56, 2014 WL 11320417, at *8 (S.D. Tex. Feb. 11, 2014). On appeal, though, this court held that all of Hines's claims failed to state a claim. *Hines v. Alldredge* (*Hines I*), 783 F.3d 197 (5th Cir. 2015).

Some things have changed since our 2015 opinion. In 2017, Texas revised statutes applicable to medical doctors, but not veterinarians, and allowed them to engage in some forms of telemedicine. The law removed Section 111.004(5), which had required face-to-face consultations to establish a physician–patient relationship before engaging in any telemedical services. Act of May 29, 2017, 85th Leg., R.S., ch. 205, § 2, 2017 Tex. Gen. Laws 379, 380. The bill also added a new section to define what a practitioner–patient relationship looks like in the context of telemedicine. *Id.* (codified at TEX. OCC. CODE § 111.005).

Then, in 2018, the United States Supreme Court decided *National Institute of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361 (2018). That case dealt with a California law requiring licensed and unlicensed crisis pregnancy centers to notify women about California's low-cost services, including abortions. *Id.* at 2368. The Ninth Circuit upheld these requirements as regulations of "professional speech." *Id.* at 2371. The

Supreme Court reversed, holding the notice requirements were unconstitutional. *Id.* at 2370.

Hines filed the present suit on October 2, 2018, in the United States District Court for the Southern District of Texas.  Based on the change in Texas's telemedicine law, Hines brought a new equal-protection claim.  Reading *NIFLA* as abrogating the professional-speech doctrine, Hines also asserts his First Amendment claims anew.  The defendants moved for dismissal on December 14, and the district court granted the motion on June 11, 2019.  Hines timely filed a notice of appeal.


DISCUSSION

We review the district court's dismissal under Rule 12(b)(6) *de novo.* *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This case involves two independent issues, one under the First Amendment and the other under the Equal Protection Clause of the Fourteenth Amendment.  We analyze them separately.

I.    *First Amendment*

Hines admits that unless *NIFLA* abrogated *Hines I*, his claims are foreclosed.  The parties ask the court to apply the "mode of analysis" test to determine whether *NIFLA* abrogated *Hines I*.  *Stokes v. S.W. Airlines*, 887 F.3d 199, 204 (5th Cir. 2018).  They disagree on how that test should be applied here.

Under the rule of orderliness, "one panel may not overrule [a prior] decision, right or wrong" unless there is an intervening change of authority.

*Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991). "[W]hen the Supreme Court expressly or implicitly overrules one of our precedents, we have the authority and obligation to declare and implement this change in the law." *Stokes*, 887 F.3d at 204 (emphasis added) (quotation marks omitted). One example of such overruling is "when the Supreme Court disavows the mode of analysis on which our precedent relied." *Id.* Put another way, "Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion establishes a rule of law inconsistent with that precedent." *Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) (quotation marks omitted). However, "an intervening change in the law must be unequivocal, not a mere 'hint' of how the [Supreme] Court might rule in the future." *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013). "[M]ere illumination of a case is insufficient" to abrogate our circuit precedent. *United States v. Petras*, 879 F.3d 155, 164 (5th Cir. 2018). Relatedly, "the determination whether a given precedent has been abrogated is itself a determination subject to the rule of orderliness." *Stokes*, 887 F.3d at 205.

After oral argument, another panel of this court issued its opinion in *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927 (5th Cir. 2020). Hines asserts in a Rule 28(j) letter that *Vizaline* resolved whether *NIFLA* abrogated *Hines I*. The defendants respond that *Vizaline* abrogated *Hines I* only to the extent it relied on the professional-speech doctrine, but it left the incidental-burden doctrine untouched. *Id.* at 930, 934.

*Vizaline* addressed a challenge to Mississippi's licensing of surveyors. *Id.* at 928. The court stated that *NIFLA* "disavowed the notion that occupational-licensing regulations are exempt from First Amendment scrutiny." *Id.* The *Vizaline* court then stated in a footnote: "Our decision in *Hines v. Alldredge*, 783 F.3d 197, 202 (5th Cir. 2015), adopted the professional speech doctrine. As explained below, *Hines'* reasoning does not survive

*NIFLA*." *Id.* at 928 n.1. The district court in *Vizaline* had viewed the surveyor regulations as restricting conduct rather than speech, and only incidentally infringing on speech, so the district court said claims about the regulations were not entitled to any First Amendment scrutiny. *Id.* at 933. The *Vizaline* court disagreed, holding that general licensing regulations are not automatically immune from First Amendment scrutiny. *Id.* at 934. Thus, the court reversed and remanded for the proper conduct-versus-speech analysis. *Id.*

In *Stokes*, we held that circuit precedent was unequivocally abrogated by Supreme Court precedent. 887 F.3d at 204–05. One party argued, though, that one of our cases after the Supreme Court's intervening decision reaffirmed our earlier caselaw. *Id.* at 205. We admitted that "the determination whether a given precedent has been abrogated is itself a determination subject to the rule of orderliness." *Id.* The case relied upon by the party, though, was unpublished, and regardless did not appear to reaffirm our prior rule. *Id.*

Unlike in *Stokes,* we are presented with a precedential opinion that held *NIFLA* abrogated *Hines I.* As explained in *Stokes*, we are to follow a prior panel's determination of whether a Supreme Court case abrogated one of our rules. *Vizaline*, therefore, is our guide.

Bound by *Vizaline*, we are no longer bound by *Hines I.* That means Hines' First Amendment claims may be entitled to greater judicial scrutiny than *Hines I* allowed. The court concluded that "the relevant question is whether" the state's "licensing requirements regulate only speech, restrict speech only incidentally to their regulation of non-expressive professional conduct, or regulate only non-expressive conduct." *Vizaline*, 949 F.3d at 931. *Vizaline* declined to give an opinion "on whether the Texas regulation at issue in *Hines* would have been upheld under the proper conduct-versus-

speech analysis." *Id.* at 934 n.9. As the *Vizaline* court did, we reverse and remand for the district court to make the initial evaluation of whether conduct or speech is being regulated. *Id.* at 934.

## II.    *Equal Protection*

In *Hines I*, we addressed a slightly different equal-protection question from the one before us now. Hines' original claim was predicated on the idea that the physical-examination requirement treated veterinarians engaging in telemedicine differently than other veterinarians. *Hines*, 2014 WL 11320417, at *5. We rejected this claim, holding:

> [T]he requirement that veterinary care be provided only after the veterinarian has seen the animal is, at a minimum, rational: it is reasonable to conclude that the quality of care will be higher, and the risk of misdiagnosis and improper treatment lower, if the veterinarian physically examines the animal in question before treating it.

*Hines I*, 783 F.3d at 203. Hines' new claim rests on treating medical doctors differently than veterinarians as to their right to engage in telemedicine.[1]

To state a claim for equal protection, "the plaintiff must prove that similarly situated individuals were treated differently." *Beeler v. Rounsavall*, 328 F.3d 813, 816 (5th Cir. 2003) (quoting *Bryan v. City of Madison*, 213 F.3d

---

[1] Texas's law for medical doctors does not allow all forms of telemedicine. Section 111.005 provides that a practitioner–patient relationship may exist and thus allow telemedicine services when there is a preexisting relationship, or the practitioner can use either synchronous or asynchronous audiovisual technology to interact with the patient. TEX. OCC. CODE § 111.005. Thus, even if Texas had the same telemedicine requirements for both doctors and veterinarians, Hines would not be allowed to give individualized advice over non-audiovisual technology like phone or email. The chasm between medical doctors and veterinarians, therefore, is not quite as wide as Hines suggests.

267, 276 (5th Cir. 2000)).  Being similarly situated is key.  "Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws."  *Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 932 (5th Cir. 1988).  On appeal, the State does not challenge the similarly situated element of the equal-protection claim, and we will assume without deciding that it is met.  Because Hines is not a member of suspect class, we consider whether the "classification rationally further[s] a legitimate state interest."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  When we apply rational basis at the failure-to-state-a-claim stage, we must treat a legislative classification "as valid 'if a court is able to hypothesize a legitimate purpose to support the action.'"  *Glass v. Paxton*, 900 F.3d 233, 245 (5th Cir. 2018) (quoting *Mahone*, 836 F.2d at 934).

Behind the Equal Protection Clause is the principle that government action should not be arbitrary.  *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Rational-basis review is guided by the principle that we do not have "a license . . . to judge the wisdom, fairness, or logic of legislative choices."  *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319 (1993) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).  "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (citations omitted).  Accordingly, "[t]he constitutional test for rationality of a legislative classification, whether the classes be distinguished in the text of the law or in its administration, is whether any rational decisionmaker could have so classified."  *Stern v. Tarrant Cnty. Hosp. Dist.*, 778 F.2d 1052, 1056 (5th Cir. 1985).

Though rational-basis review gives broad discretion to legislatures, it is not unlimited.  The Supreme Court says to presume legislation is valid. *City of Cleburne*, 473 U.S. at 440.  We have stated that to uphold a state's classification, a court need find only "a conceivable rational basis for the official action."  *Reid v. Rolling Fork Pub. Util. Dist.*, 854 F.2d 751, 754 (5th Cir. 1988) (emphasis omitted).  Notably, however, we have made clear that "rational" still must be actually rational, not a matter of fiction.  *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013).

We examine our opinion in *St. Joseph Abbey* closely because it provides a recent and thorough explanation.  There, we considered a district court's order enjoining the enforcement of a Louisiana rule that granted funeral homes the exclusive right to sell caskets. *Id.* at 217.  A group of monks at an abbey constructed and sold wooden caskets. *Id.*  This practice violated the state's rule that only a state-licensed funeral director of a state-licensed funeral home could sell caskets to people in the state. *Id.* at 218.  The abbey sued, seeking declaratory and injunctive relief based on theories of substantive due process and equal protection. *Id.* at 220.  The state argued that economic protection of the funeral industry was a legitimate state interest, but after a bench trial, the district court disagreed. *Id.*  Applying rational-basis review, we affirmed. *Id.* at 227.

We explained that "although rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *Id.* at 223.  We compared the state's offered rationale to the setting and history of the challenged rule. *Id.*  The state's first articulated reason was economic protection of a discrete industry. *Id.* at 221.  We held, though, that pure economic protectionism is not by itself a legitimate state interest. *Id.* at 222–23.  A law motivated by protectionism may have a rational basis, but "naked economic preferences are impermissible to the extent that

they harm consumers." *Id.* at 223 (quoting *Greater Hous. Small Taxicab Co. Owners Ass'n v. City of Hous.*, 660 F.3d 235, 240 (5th Cir. 2011)).

The state had two additional reasons for the casket rule: consumer protection and public health and safety. *Id.* at 223, 226. The state argued that by controlling who could sell caskets, it could police deceptive sales tactics and thus protect consumers. *Id.* at 223. We held that this reasoning was irrational. The state did not require individuals to be buried in caskets, and the Federal Trade Commission found no evidence of consumer deception by third-party casket sellers. *Id.* at 225. Overall, the structure of the law revealed a "disconnect between the *post hoc* hypothesis of consumer protection and the grant of an exclusive right of sale to funeral homes." *Id.* at 226. As for health and safety, we found the reason disconnected from reality. *Id.* The state did not require caskets to be constructed a certain way nor did the state require funeral directors to have special expertise about caskets. *Id.* Accordingly, there was no rational relationship "between public health and safety and limiting intrastate sales of caskets to funeral establishments." *Id.*

"A hypothetical rationale, even *post hoc*, cannot be fantasy." *Id.* at 223. "[G]reat deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation." *Id.* at 226. In the end, all that was left of the state's motivation was economic protectionism that actually seemed to harm consumers. *See id.* at 226–27. Despite "try[ing] as we [were] required to do, we c[ould] suppose" no rational basis for the challenged law. *Id.* at 227. We upheld the district court's injunction against the state's actions against the abbey. *Id.*

We do not read *St. Joseph Abbey* to hold that a plaintiff alleging an equal-protection claim is always entitled to present evidence and make it

beyond the motion-to-dismiss stage.  Indeed, such a reading would ignore that a state is not required "to produce evidence to sustain the rationality of a statutory classification."  *Heller*, 509 U.S. at 320.  *St. Joseph Abbey* dealt with a "purported rational basis that rose to the level of 'fantasy.'"  *Glass*, 900 F.3d at 245 (quoting *St. Joseph Abbey*, 712 F.3d at 223).  In addition, the court tried to conceive other potentially rational bases but could not think of any.  *St. Joseph Abbey*, 712 F.3d at 227.  We do not consider *St. Joseph Abbey* to have altered how we conduct rational-basis review; instead, it thoroughly applied that standard of review to an irrational law.

Turning now to the statute before us, we remind ourselves that it was rational for the state legislature to conclude that an in-person examination of an animal reduces "the risk of misdiagnosis and improper treatment." *Hines I*, 783 F.3d at 203.  Hines contends that Texas's new telemedicine law shows our prior conclusion was misguided because Texas now believes expanding telemedical services for humans will improve overall care.  To the extent Hines is claiming that there is a disparity between care for animals that do not have access to in-person veterinary care and care for animals that do, that claim is foreclosed by our prior opinion.  We will not consider anew the rationality of treating veterinarians engaging in telemedicine differently than veterinarians practicing in person.  The new issue is equal protection for the State's choice to allow doctors who treat humans to engage in telemedicine but not doctors who treat animals.

Hines tries to rebut a number of conceivable justifications for regulating telemedicine differently than televeterinary services.  The State offers several reasons why Texas would treat veterinarians and medical doctors differently, citing several of the reasons conceived by the district court.  "[H]umans ordinarily can communicate about their own symptoms with a doctor via electronic means, whereas animals cannot."  Additionally, "humans typically understand human physiology better than animal

physiology." Hines rejects these reasons by identifying inconsistencies such as the fact that some humans, like infants, are also unable to speak.

A classification may be underinclusive or overinclusive and yet survive rational-basis review. *Harris v. Hahn*, 827 F.3d 359, 369 (5th Cir. 2016). The Constitution does not require perfect policies to achieve a state's legitimate interests. *Id.* "When a legislature has a choice of means, each rationally related to its legislative purpose, it may constitutionally choose any of them. Its choice of one does not render the others irrational." *Stern*, 778 F.2d at 1056. That Texas has taken a different approach for medical doctors and for veterinarians is not *per se* irrational. *Id.* We find helpful our now-colleague's analysis in a Texas Supreme Court opinion:

> It is instructive to consider the U.S. Supreme Court's first occupational licensing case, from 1889. In *Dent v. West Virginia* — which has never been overruled and is still cited approvingly — the Court upheld a physician-licensing regime, calling it a way to protect "the general welfare of [the] people" and "secure them against the consequences of ignorance and incapacity, as well as of deception and fraud." But the Court cautioned that constitutional limits exist. Government is free to mandate requirements "appropriate to the calling or profession," but not those that "have no relation to such calling or profession." Why? Because that would "deprive one of his right to pursue a lawful vocation." Restrictions must have a reasonable connection to the person's fitness or capacity. That explains the High Court's 1957 ruling in *Schware v. Board of Bar Examiners*, the only time the Court has struck down a licensing restriction under rational-basis review. In *Schware*, the Court invalidated New Mexico's attempt to bar a Communist Party member from practicing law: "any

> qualification must have a rational connection with the applicant's fitness or capacity to practice."

*Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 110–11 (Tex. 2015) (Willett, J., concurring) (footnotes omitted).  The key is rational connection.

We agree with the State here that it is rational to distinguish between humans and animals based on the species' differing capabilities.  More to the point, though, the law's differentiating between medical doctors and veterinarians is a logical distinction, unlike the artificial line-drawing of the casket rule considered in *St. Joseph Abbey*.  Texas's statutory requirements for medical doctors are found in Title 3 of the Texas Occupations Code, while the requirements for veterinarians are in Title 4.  The occupations have different governing boards and rulemaking bodies.  They require different schooling.  They treat different subjects, and the treatment sometimes differs substantially.  The professions have their similarities, of course, but in our inquiry, there are rational reasons to believe regulations suitable for one profession are not constitutionally required for the other.

One Texas appellate court considered whether the Texas Medical Liability and Insurance Improvement Act applied to veterinarians.  *Neasbitt v. Warren*, 22 S.W.3d 107, 108 (Tex. App.—Fort Worth 2000, no pet.).  The defendant in the negligence action, a veterinarian, sought a cost bond under the medical liability law, which on its face applied only to health care providers or physicians.  *Id.*  Observing the different statutory schemes for physicians and veterinarians, the court held that the liability law did not apply to the claim against the veterinarian.  *Id.* at 112.  The court stated, "The reality that physicians and veterinarians have traditionally been licensed and regulated by entirely separate state boards and under entirely different statutes provides further support for differentiating between the two professions." *Id.* at 111.  We agree with that sentiment.

14

Moreover, unlike the challenged law in *St. Joseph Abbey*, the physical-examination requirement for veterinarians is not a protectionist measure designed to stop veterinarians from competing with medical doctors. *See St. Joseph Abbey*, 712 F.3d at 226–27.  Indeed, medical services are not an economic substitute for veterinarian services.  That means the services are not interchangeable.  In the antitrust-law context, we could say that the two services are not part of the same relevant product market, competing against one another.  *Apani S.W., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002).  Our takeaway is that Texas's physical-examination requirement is not a "naked transfer of wealth" from veterinarians to medical doctors because those two professions are not in competition with one another to begin with.  *See St. Joseph Abbey*, 712 F.3d at 223.  The state-licensed funeral homes could raise prices on caskets because of the state's rule disallowing the abbey from selling caskets in state.  *See id.* at 226.  By contrast, physicians practicing telemedicine are not able to raise prices due to the regulations on veterinarians' practice of telemedicine.

It is not irrational for a state to change in stages its licensing laws to adapt to our new, technology-based economy.  If the Texas legislature finds the recently enacted changes on telemedicine successful, it may decide to expand those changes to include veterinarians.  It is reasonable to have a trial period rather than to make a hasty policy change.  Though we could conceive no rational basis for the law challenged in *St. Joseph Abbey*, we can conceive many rational bases here.  The district court properly dismissed Hines' equal-protection claim.

We AFFIRM in part, REVERSE in part, and REMAND for further proceedings.

No. 19-40605

JENNIFER WALKER ELROD, *Circuit Judge*, concurring in part[1] and dissenting in part:

To prevail at this stage, Dr. Hines must show only that Texas lacks a rational basis for prohibiting veterinarians from using telemedicine the same way medical doctors can. Because I believe Dr. Hines has made this showing, I would reverse the district court's dismissal of Dr. Hines's Equal Protection claim.

Under Texas law, a veterinarian must either examine an animal directly or visit the premises on which the animal is kept before establishing a patient relationship. Tex. Occ. Code § 801.351(b). Only after doing one of those two things may a veterinarian treat an animal via virtual means. Medical doctors, on the other hand, may form a patient relationship entirely through virtual means. Dr. Hines contends that Texas's different and more burdensome requirement for veterinarians practicing telemedicine compared to medical doctors practicing telemedicine violates the Fourteenth Amendment's guarantee of equal protection of the laws.

The Equal Protection clause forbids the Government from giving differential treatment to people who are similarly situated, unless the Government has a rational basis for doing so. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *Gibson v. Tex. Dep't of Ins.—Div. of Workers' Comp.*, 700 F.3d 227, 238 (5th Cir. 2012). Here, the only question is whether, accepting as true all well-pleaded facts in Dr. Hines's complaint, he has plausibly alleged that he has been treated differently than other similarly situated

---

[1] I agree with the majority opinion that the case should be remanded to the district court so that the regulation at issue can be evaluated under *National Institute Of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) and *Vizaline L.L.C. v. Tracy*, 949 F.3d 927 (5th Cir. 2020).

No. 19-40605

individuals and he has plausibly alleged that no rational basis accounts for the difference. In my view, Dr. Hines has done so and thus, has stated a claim.

The district court concluded that doctors and veterinarians are similarly situated for the narrow purpose of analyzing the laws that concern telemedicine. As the district court acknowledged, doctors and veterinarians belong to different professions. Nevertheless, both groups provide medical advice to living subjects and the benefits and drawbacks of expanding access to medical care through telemedicine are the same for both groups.

While the majority opinion purports to assume that doctors and veterinarians are similarly situated with respect to telemedicine laws, since this issue was not appealed, the opinion's analysis places great weight on differences between the professions that go to the "similarly situated" element. For instance, the majority opinion notes that the occupations have different governing boards and rulemaking bodies and that they attend different types of educational institutions for their training. However, the district court expressly considered that "doctors and veterinarians are subject to different licensing boards and are considered separate professions" when it decided that that the "similarly situated" element was met. The majority opinion "assumes" this holding but then undercuts it to support the conclusion that Texas's telemedicine laws pass rational basis review. I agree with the magistrate judge and district court that veterinarians and doctors are similarly situated regarding regulation of their use of telemedicine.

I would further hold that the state has failed to demonstrate a rational basis for their disparate regulation, at least at this stage of litigation.[2] When we conduct a rational basis review, legislation is presumed valid, but a

---

[2] The magistrate judge concluded that Texas lacked a rational basis, but the district court held that Texas did have a rational basis.

presumption is not a guarantee. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013). "[A]lthough rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey*, 712 F.3d at 223. A "hypothetical rationale, even *post hoc*, cannot be fantasy." *Id.* When a plaintiff provides a court with undisputed context that betrays the otherwise rational basis the state has offered, the state can no longer expect the court's deference. Rational basis review is a level of scrutiny, not a rubber-stamping exercise. *See Harris Cty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 323 (5th Cir. 1999) ("[T]he rational basis test 'is not a toothless one.'") (quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)).

*St. Joseph Abbey* was a recent and standard application of rational basis review in action. In that case, an abbey of Benedictine monks who sold handcrafted caskets challenged the state of Louisiana's rules that allowed only state-licensed funeral homes to sell caskets to people in Louisiana. *St. Joseph Abbey*, 712 F.3d at 217–18. Louisiana offered three seemingly plausible bases for the challenged rules: economic protection of the funeral industry, consumer protection for casket purchasers, and public health and safety for casket purchasers. As to the first rationale, our court in *St. Joseph Abbey* ruled that economic protection of a favored industry is not, on its face, a legitimate state interest. *Id.* at 222–23. As to the second and third rationales, both were seemingly plausible. If all rational basis review required was the offering or conjecture of a seemingly plausible basis, the court could have stopped there and dismissed the monks' claim.

Instead, the court considered the context that the monks put forward, which negated both of the state's bases. For instance, regarding "health and safety," the monks pointed out that Louisiana did not require caskets for

18

burial, did not impose requirements for their construction or design, did not require a casket to be sealed before burial, and did not require funeral directors to have any special expertise in caskets. *Id.* at 223–27. These facts fatally undermined the logic of Louisiana's "health and safety" basis for permitting only funeral homes to sell caskets to in-state customers.[3]

*St. Joseph Abbey* does not mean, as perhaps the majority opinion fears, that Equal Protection claims can never be dismissed at the 12(b)(6) stage or that survival of a claim at the 12(b)(6) stage is equivalent to a judgment as a matter of law in favor of the plaintiff. In cases where the state provides a rational basis for the challenged law and the plaintiffs are unable to negate the basis, the case will be dismissed. But where the state provides only a theoretically plausible rationale and the plaintiff is successful in affirmatively undermining the logic that makes that basis rational, then the claim can proceed to an evidentiary stage. In that stage, the state may be able to provide evidence or better argumentation that rehabilitates their bases for the challenged law or supports new bases. If the state does so, the Equal Protection claim later may be dismissed before trial, even though the claim survived a motion to dismiss.

In this case, like in *St. Joseph Abbey*, the state has offered several seemingly plausible bases for its differential treatment of veterinarians and

---

[3] Our precedent contains many more examples of cases where state laws or regulations have failed rational basis review. *See, e.g.*, *Doe v. Plyler*, 628 F.2d 448, 458 (5th Cir. 1980), *aff'd* 457 U.S. 202 (1982) (holding that a Texas statute that had been applied so as to deny free public education to children based on their undocumented status violated the Equal Protection clause, despite the school district's asserted justifications); *Thompson v. Gallagher*, 489 F.2d 443, 449 (5th Cir. 1973) (holding that city ordinance requiring that any veteran employed by the city have an honorable discharge was not reasonably related to the city's interest in maintaining the quality of its work force, in part because it subjected veterans to standards to which nonveterans were not subjected).

No. 19-40605

doctors. However, Dr. Hines has offered context that belies the rationality of these differences.[4]

Texas provided three potential rational bases for the differential treatment: *First*, humans' ability to communicate with their physicians enables them to receive better telemedical care than animals. *Second*, humans are more familiar with human physiology and can describe it to the doctor. *Third*, having higher standards for telemedicine for animals is rational because of the importance of preventing the spread of zoonotic disease, which can pass to humans.

The magistrate judge concluded that the state's rationales were irrational, and aptly explained why in his report and recommendation:

---

[4] The majority believes the holding of *Hines v. Alldredge*, 783 F.3d 197, 203 (5th Cir. 2015) (*Hines I*) has a preclusive effect on our rational basis review of the telemedicine restrictions for veterinarians. Dr. Hines challenged the restriction on Equal Protection grounds in his 2013 lawsuit, *Hines I*, on the basis that he was treated irrationally, being a duly licensed veterinarian but forbidden from providing veterinary advice like his colleagues who ran brick-and-mortar clinics. The Fifth Circuit rejected the challenge, concluding: "it is reasonable to conclude that the quality of care will be higher, and the risk of misdiagnosis and improper treatment lower, if the veterinarian physically examines the animal in question before treating it." *Hines I*, 783 F.3d at 203.

But the situation has since changed. When Dr. Hines brought his initial suit, doctors and veterinarians were treated similarly with respect to their practice of telemedicine. In 2017, the Texas legislature revised the statutes applicable to medical doctors and removed their restriction, allowing medical doctors to establish a doctor-patient relationship solely through electronic means. Veterinarians, however, remained subject to the restriction requiring an in-person visit before providing telemedical care. The 2017 revision to statutes regulating medical doctors changes the posture of this case and the effect of *Hines I*. In short, the holding of *Hines I* was based on a premise that is no longer true: that Texas believes the risks of telemedicine without an initial in-person visit outweigh the potential benefits of increased access. We are not bound to again uphold the telemedicine restriction merely because it was upheld previously under different circumstances.

No. 19-40605

> If a pediatrician can use telemedicine to treat a three-month old infant—based upon medical records, the parent's description of external symptoms and a visual examination of the child— the Court cannot adduce why a veterinarian cannot do the same for a dog, cat, or hamster.

As Dr. Hines argues, "[i]t simply is not rational to allow telemedicine without a physical examination for babies but deny the same form of telemedicine for puppies on the ground that puppies cannot speak."[5] Babies and other non-communicative adults were intentional beneficiaries of Texas's expansion of telemedicine, not the subjects of unwitting overinclusion. Texas has never shown a preference for animals over humans that would support requiring higher standards for animals' medical treatment. *Cf. Strickland v. Medlen*, 397 S.W.3d 184, 185 (Tex. 2013) (Willett, J.) (holding that dog owners could not recover non-economic damages for loss of companionship under Texas tort law because "[p]ets are property in the eyes of the law.").

---

[5] In my view, the magistrate judge's reasoning is fatal to both the state's first and second rationales. The district court disagreed, accepting both. The district court then considered in greater detail and accepted the state's third rationale that requiring veterinarians to physically examine an animal before subsequently treating that animal via telemedicine can improve human health by suppressing zoonotic disease. However, this rationale simply is not based in reality, considering that the restriction on telemedicine does not actually require a veterinarian to inspect an animal for disease during an initial examination or even, in fact, require an in-person examination of each animal. A veterinarian can begin a veterinarian-patient relationship with an animal as long as he or she has visited the premises on which the animal is kept. *See* Tex. Occ. Code § 801.351(b). Furthermore, this theoretical rationale is again betrayed by the fact that medical doctors establishing a doctor-patient relationship are not required to physically examine their human subjects at all, despite the fact that human-to-human transmission of diseases poses a far greater risk to human health. If the state's goal was to reduce diseases affecting humans, the existing telemedicine restriction on veterinarians would be a fantastical means of achieving it.

No. 19-40605

Although the rational basis test is deferential, it does not require us to accept "nonsensical explanations for regulation." *St. Joseph Abbey*, 712 F.3d at 226. The magistrate judge correctly concluded that Texas's explanations are indeed nonsensical. I therefore respectfully dissent.