# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 8, 2022

Lyle W. Cayce
Clerk

No. 21-60898

Golden Glow Tanning Salon, Incorporated,

*Plaintiff—Appellant*,

*versus*

City of Columbus, Mississippi,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:20-CV-103

Before Jones, Ho, and Wilson, *Circuit Judges*.
Edith H. Jones, *Circuit Judge*:

Golden Glow Tanning Salon filed a civil rights suit against the City of Columbus, which shut down its business for seven weeks at the outset of the Covid-19 pandemic. The district court granted the City's motion for summary judgment. Subsequent experience strongly suggests that draconian shutdowns were debatable measures from a cost-benefit standpoint, in that they inflicted enormous economic damage without necessarily "slowing the

No. 21-60898

spread" of Covid-19.[1]  The balance of impacts was not well understood at the time, however, and we are constrained to affirm.

## I. Background

On March 14, 2020, the Governor of Mississippi declared a state of emergency in response to the Covid-19 pandemic.  One week later, the City of Columbus, Mississippi, promulgated an ordinance ("the City Ordinance") declaring a civil emergency and including a number of measures to counter the spread of the virus.  Section 2 of the City Ordinance subjected Golden Glow and many other businesses to mandatory closure from March 21 through May 9, 2020.[2]  The ordinance's stated purpose was to reduce excessive person-to-person contact in order to slow the spread of Covid-19.  Violations were punishable by fine or imprisonment.

An owner of Golden Glow told the mayor and two city council members that his tanning business could operate without person-to-person contact and that no more than two people needed to be in the business at any one time.  The City made no exception for the salon.  On May 20, 2020, Golden Glow filed suit under 42 U.S.C. § 1983 against the City, alleging that the City Ordinance violated the Equal Protection Clause and constituted a

---

[1] *See Great Barrington Declaration*, https://gbdeclaration.org (last visited Oct. 24, 2022); Jonas Herby, Lars Jonung & Steve H. Hanke, *A Literature Review and Meta-Analysis of the Effects of Lockdowns on Covid-19 Mortality*, 200 Studs. in Applied Econs. 1 (2022); Alex Berenson, Unreported Truths about Covid-19 and Lockdowns (2020).

[2] Other businesses subject to closure included "bars, nightclubs, meetings of fraternal and civic organizations, child care facilities, bowling alleys, recreational facilities, skating rinks, tattoo parlors, gyms, barbershops, hair/beauty and nail . . . salons, spas, convention centers, community centers, and parks."  The City Ordinance also restricted "all churches, temples and places of worship, assemblages and gatherings" to "no more than 10 people."

taking under the Fifth Amendment.[3]  The district court granted summary judgment for the City.  Golden Glow timely appealed.

## II. Discussion

This court "reviews the district court's grant of summary judgment *de novo*, applying the same standards as the district court." *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235, 238 (5th Cir. 2011) (internal quotation omitted).  A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

Golden Glow initially contends that the City Ordinance violated equal protection by treating tanning salons differently from churches, Wal-Marts, and liquor stores.  The salon also contends that the shutdown constituted a *per se* taking under the Fifth Amendment, for which Golden Glow is entitled just compensation.

### A. Equal Protection

### 1. "Similarly Situated"

To establish an equal protection claim, Golden Glow must first show that it was treated differently from another similarly situated business.  *See Tex. Ent. Ass'n v. Hegar*, 10 F.4th 495, 513 (5th Cir. 2021); *see also Hines v. Quillivan*, 982 F.3d 266, 272–73 (5th Cir. 2020).  "Similarly situated" means "in all relevant respects alike." *Tex. Ent. Ass'n*, 10 F.4th at 513 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 2331 (1992)) (sports bars

---

[3] Golden Glow also asserted unreasonable seizure and due process claims, but those are not before this court.

featuring scantily clad waitresses were not similarly situated to erotic clubs under Texas law regulating sexually oriented businesses); *see also Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 468 (5th Cir. 2021) (Covid-19 orders permitting restaurants to reopen but requiring bars to remain closed treated similarly situated businesses differently).

To determine what businesses are similarly situated to tanning salons, we must consider "the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant" when making the classification. *Stratta v. Roe*, 961 F.3d 340, 360 (5th Cir. 2020) (alteration in original) (quoting *Lindquist v. City of Pasadena Tex.*, 669 F.3d 225, 234 (5th Cir. 2012)) (expounding upon "similarly situated" in class-of-one equal protection claims). "[T]he inquiry is case-specific." *Lindquist*, 669 F.3d at 234. For example, this court has held that two seemingly identical bars, located next to each other and selling wine and beer, were not similarly situated as to liquor permits where one establishment was grandfathered with more generous terms than were available to the other under a subsequent local ordinance. *See Beeler v. Rounsavall*, 328 F.3d 813, 817 (5th Cir. 2003).

First, there are similarities between tanning salons and the other businesses shut down by the City Ordinance. Each class of shut-down business provides recreational, social, or, as some would say, "non-essential" services; the clientele typically spend more than a few minutes at the location; and the likelihood of close person-to-person contact may pose risks. Tanning salons fit squarely within this mold. They provide a largely aesthetic service, and their clientele typically spend at least 15 minutes onsite. Even though Golden Glow contends that tanning salons can be modified to avoid close contact between customer and employee, the customer must spend more than a few minutes in a small, enclosed space while partially clothed.

Second, Golden Glow can rationally be differentiated from churches, large retailers like Wal-Mart, and liquor stores, none of which were closed by the City Ordinance. As the district court explained, those three comparators "provide different services," "are in different positions," "and do not present the same health and safety concerns"; they are "simply not similarly situated."

We agree with the district court's reasoning, at least with regard to churches and Wal-Marts. Under a public health ordinance, churches and Wal-Marts are not "in all relevant respects alike" to tanning salons for equal protection purposes. Churches enjoy special protection under the First Amendment. Indeed, to treat churches any worse than secular businesses would likely run afoul of the Constitution. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam). Churches are different in kind from tanning salons and are not similarly situated under the City Ordinance.

Additionally, while large retailers like Wal-Mart offer some social or recreational services, they are important suppliers of an abundance of necessary goods. True, Wal-Marts and tanning salons both sell artificial tanners. Even so, stores with partially similar inventories are not necessarily similarly situated. *See Beeler*, 328 F.3d at 817. Golden Glow has not shown that Wal-Marts and tanning salons are "in all relevant respects alike," that is, that Wal-Marts offer predominantly social or recreational services and present the same health and safety concerns as the City thought problematic for tanning salons.

Liquor stores, however, may present a close call as to certain relevant similarities with tanning salons. Neither business offers an essential service

to the community.[4]  As with tanning salons, the actual transaction between a customer and clerk may take only a few seconds.  Moreover, both establishments can operate without close person-to-person contact.  But a defining feature of the tanning salon, and a distinguishing characteristic from the liquor store, is that customers disrobe and occupy a small space for fifteen minutes or more.  In an abundance of caution, we assume they are similar.

## 2. Rational Basis Review

The next task is to determine the "appropriate level of scrutiny for our review." *Big Tyme Invs.*, 985 F.3d at 468.  Rational basis review applies to legislative classifications unless the "classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class," in which case, strict scrutiny applies. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312, 96 S. Ct. 2562, 2566 (1976) (per curiam) (footnotes omitted).  Golden Glow argues that the City Ordinance should be subject to strict scrutiny because it deprives certain business owners of a fundamental right—namely, the right to work.

The Supreme Court does not now recognize a fundamental right to work and has consistently applied rational basis review "to state legislation restricting the availability of employment opportunities." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S. Ct. 1153, 1162 (1970) (refusing to apply a heightened standard of review even to a law restricting "the most basic economic needs of impoverished human beings").  As the Court put it in *Conn v. Gabbert*, "the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose

---

[4] The City makes a strained argument that liquor stores provide a necessary service because they supply alcohol to alcoholics.  This is not a reasonable ground for considering liquor stores any more "essential" than tanning salons.

No. 21-60898

one's field of private employment, but a right which is nevertheless subject to reasonable government regulation." 526 U.S. 286, 291–92, 119 S. Ct. 1292, 1295–96 (1999). Accordingly, rational basis review applies to this dispute.[5]

Under this standard, a governmental classification "will be upheld 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Greater Houston Small Taxicab*, 660 F.3d at 239 (quoting *Heller v. Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 2642 (1993)). This "differential treatment is justified by any reasonably conceivable state of facts." *Id.* (internal quotation omitted). But the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446, 105 S. Ct. 3249, 3258 (1985).

Golden Glow contends that the City Ordinance created an arbitrary distinction between tanning salons and liquor stores that bore no rational relationship to public health given the salon's ability to operate safely and without customer contact. The City responds that tanning salons, when compared to liquor stores, were not "so important to society that the benefits of continued operations . . . outweigh[ed] the risks of spreading the virus."

---

[5] Golden Glow also attempts to claim strict scrutiny by arguing that the City Ordinance violates the Establishment Clause and thus "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *Duarte v. City of Lewisville*, 858 F.3d 348, 354 (5th Cir. 2017). Golden Glow first raised this claim in summary judgment briefing, but the district court did not address it in the opinion granting summary judgment. Even if the claim was not waived for late filing, *see Bye v. MGM Resorts Int'l, Inc.*, _F.4th_, 2022 WL 4533723, at *5–6 (5th Cir. Sept. 28, 2022), it is meritless. That religious exercise and assembly are granted specific constitutional protection is not a back-door means to argue that secular organizations are entitled to be treated the same by regulations; the Constitution created the difference.

The City rationalizes that the length of time spent in a tanning bed as compared to a liquor store raised the probability that the virus was more likely to spread in a tanning salon.

This proffered reason is not arbitrary. *See Big Tyme Invs.*, 985 F.3d at 469 (shutting down bars but leaving restaurants open to reduce the spread of Covid-19 was not irrational). Further, this conclusion is not altered by Golden Glow's contention that it could have maintained a safer environment than could liquor stores. Under rational basis review, overinclusive and underinclusive classifications are permissible, as is some resulting inequality. *See Vance v. Bradley*, 440 U.S. 93, 108, 99 S. Ct. 939, 948 (1979); *Heller*, 509 U.S. at 321, 113 S. Ct. at 2643. The City Ordinance may have been overinclusive in the absence of exceptions for safe and sterile tanning salons, and underinclusive for failing to shut down every similarly situated business. But such imperfections do not make a law supported by at least one "conceivable basis" an irrational one. *F.C.C. v. Beach Comm's, Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 2102 (1993) (internal quotation omitted). Golden Glow's equal protection claim fails rational basis review.

## B. Taking

The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, guarantees that private property shall not "be taken for public use, without just compensation." U.S. CONST. amend. V. The physical appropriation of private property by the government is the "clearest sort of taking." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S. Ct. 2448, 2457 (2001)). And a physical appropriation resulting from government regulation is "no less a physical taking." *Id.* at 2072. Such regulation constitutes a "*per se* taking." *Id.*

No. 21-60898

A *per se* taking also occurs in the "rare situation[]" "where regulation denies all economically beneficial or productive use of land." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 1016–17, 112 S. Ct. 2886, 2893–94 (1992) (positing that "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation"). But when the government "instead imposes regulations that restrict an owner's ability to *use* his own property," the "flexible test developed in *Penn Central*" applies. *Cedar Point Nursery*, 141 S. Ct. at 2071–72 (emphasis added). That balancing test weighs "factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id.* at 2072 (quoting *Penn Central Transp. Co. v. N.Y.C.*, 438 U.S. 104, 124, 98 S. Ct. 2646, 2659 (1978)).

Golden Glow argues that the closure of the salon was a *per se* taking because it amounted to both a physical invasion under *Cedar Point Nursery* and a total deprivation of productive use under *Lucas*. *Cedar Point Nursery* involved a California regulation that granted to labor organizations a "right to take access to an agricultural employer's property in order to solicit support for unionization." *Id.* at 2069. Access was required for up to three hours per day, 120 days per year. *Id.* The Court held that the "right to take access" amounted to a "*per se* physical taking" because it appropriated "for the enjoyment of third parties the owners' right to exclude," which "is 'one of the most treasured' rights of property ownership." *Id.* at 2072, 2080 (citation omitted). *Cedar Point Nursery* does not apply here because the City Ordinance did not authorize physical intrusions onto Golden Glow's property.[6]

---

[6] Golden Glow speculates that the City would have padlocked the salon's doors had Golden Glow refused to comply. There is no basis for this conclusion in the record. The City Ordinance penalized violations with fines and/or imprisonment.

*Lucas* is also inapposite. There, the Supreme Court held that a statute barring the erection of any permanent habitable structures on certain beachfront lots could constitute a taking because the land had "been rendered valueless." 505 U.S. at 1017, 1020, 112 S. Ct. at 2896.[7] But the Court also affirmed that landowners are not entitled to compensation when they are prevented from using their property for only *some* productive purposes. *Id.* at 1015–19, 112 S. Ct. at 2894–96. Here, the closure of the salon constitutes a deprivation of *some* economically productive uses (*i.e.*, the uses forbidden by the Ordinance's Section 2). Nothing in the record supports the conclusion that the City Ordinance rendered the entire property "valueless." The district court was correct to find that there had been no *per se* taking.[8]

For the foregoing reasons, we AFFIRM the judgment.

---

[7] In footnote 8, Justice Scalia acknowledged that a landowner with even a 95% loss cannot "claim the benefit" of this "categorial formulation." The *Penn Central* test would instead apply in such a case. *Lucas*, 505 U.S. at 1019 n.8, 112 S. Ct. at 2895 n.8.

[8] Golden Glow devotes one paragraph of its appellate brief to the argument that a regulatory taking occurred under the *Penn Central* balancing test. That argument is waived on appeal because Golden Glow did not argue *Penn Central* before the district court. *See Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 257 n.15 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1071 n.1 (5th Cir. 1994) (en banc) (per curiam).

No. 21-60898

JAMES C. HO, *Circuit Judge*, concurring:

The Supreme Court has recognized a number of fundamental rights that do not appear in the text of the Constitution. But the right to earn a living is not one of them—despite its deep roots in our Nation's history and tradition. Governing precedent thus requires us to rule against the countless small businesses, like Plaintiff here, crippled by shutdown mandates imposed by public officials in response to the COVID-19 pandemic. Cases like this nevertheless raise the question: If we're going to recognize various unenumerated rights as fundamental, why not the right to earn a living?

\* \* \*

The COVID-19 pandemic triggered "one of the broadest exercises of state power over individuals in the country's history." Eugene Kontorovich, Lochner *Under Lockdown*, 2021 U. CHI. LEGAL F. 169, 182 (2021). Millions of wage earners and small business owners watched helplessly as public officials claimed the "extraordinary power to force people from their chosen occupations, destroy vast investment and reliance interests, and make millions dependent on government assistance"—marking a "radical departure from prior practice, and perhaps prior imagination, of the scope, intensity, and duration of government power over private business." *Id.*

It was only by the grace of government that we would eventually begin our return to normalcy. That's because our current law of unenumerated rights prioritizes non-economic activities over economic endeavors.

A principled approach to the Constitution can take one of two forms: We can enforce only those rights that are expressly enumerated in the Constitution. Or we can recognize a broader range of fundamental rights, including those not expressly stated in the Constitution, by appealing to some principle not explicit in the text.

No. 21-60898

The Supreme Court has taken the latter approach. It has long said that it will recognize "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (cleaned up). And it reaffirmed this approach earlier this year. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242, 2246 (2022).

Under the Court's approach to unenumerated rights, we privilege a broad swath of non-economic human activities, while leaving economic activities out in the cold. Scholars have suggested, however, that this may get things backwards. After all, if anything, "the right to pursue callings and make contracts . . . have *better* historical grounding than more recent claims of right that have found judicial favor." James W. Ely Jr., *"To Pursue Any Lawful Trade or Avocation": The Evolution of Unenumerated Economic Rights in the Nineteenth Century*, 8 U. Pa. J. Const. L. 917, 953 (2006) (emphasis added). *See also*, *e.g.*, Timothy Sandefur, The Right to Earn a Living: Economic Freedom and the Law (2010); David E. Bernstein, *The Due Process Right to Pursue a Lawful Occupation: A Brighter Future Ahead?*, 126 Yale L.J. F. 287 (2016); Steven G. Calabresi & Larissa C. Leibowitz, *Monopolies and the Constitution: A History of Crony Capitalism*, 36 Harv. J.L. & Pub. Pol'y 983 (2013); Timothy Sandefur, *The Right to Earn a Living*, 6 Chap. L. Rev. 207 (2003).

For over a century before our Founding, English courts protected the right to pursue one's occupation against arbitrary government restraint. *See*, *e.g.*, 1 William Blackstone, Commentaries on the Laws of England 415 ("At common law every man might use what trade he pleased."); Sandefur, *supra*, at 18–23; Calabresi & Leibowitz, *supra*, at 989–1003. This right emerged out of the struggles between the Crown and the courts over the problem of monopoly—a term that was understood at the

time to mean any "company insulated from competition by a special legal privilege which barred others from competing." Sandefur, *supra*, at 219–20. The Crown attempted to confer special privileges by allowing only a select few to practice certain occupations. *See* Sandefur, *supra*, at 20–21; Calabresi & Leibowitz, *supra*, at 996–1003. English courts responded with hostility to such efforts. For example, Lord Chief Justice of England Edward Coke observed that "the common law abhors all monopolies, which prohibit any from working in any lawful trade." *The Case of the Tailors, &c. of Ipswich*, 77 Eng. Rep. 1218, 1219 (K.B. 1615). Eventually, Parliament enacted the Statute of Monopolies in 1623, prohibiting monopolies while allowing exceptions for patentable inventions. *See* Sandefur, *supra*, at 20–21; Calabresi & Leibowitz, *supra*, at 996–1003. *See also* Bernstein, *supra*, at 288 (describing the "ancient Anglo-American constitutional tradition opposed to governmental grants of monopoly power to aid favored businesspeople and exclude others") (collecting authorities).

This aversion to monopolies was brought to the American colonies. The Massachusetts Body of Liberties of 1641 contained an express prohibition on monopolies, stating that "[n]o monopolies shall be granted or allowed amongst us, but of such new Inventions that are profitable to the Countrie, and that for a short time." *See also* Michael Conant, *Antimonopoly Tradition Under the Ninth and Fourteenth Amendment:* Slaughter-House Cases *Re-Examined*, 31 Emory L.J. 785, 797 (1982). And later, members of the Founding generation agreed on the fundamental importance of the right to pursue one's occupation. Benjamin Franklin wrote that "[t]here cannot be a stronger natural right than that of a man's making the best profit he can of the natural produce of his lands." *Causes of the American Discontents before 1768*, *in* Benjamin Franklin: Writings 613 (Lemay ed., 1987). George Mason authored the Virginia Declaration of Rights and included an express provision securing "the enjoyment of life and liberty, with the means

of acquiring and possessing property, and pursuing and obtaining happiness and safety." Va. Decl. of Rights § 1 (1776). *See* Sandefur, *supra*, at 24. Mason would later oppose the Constitution precisely because he feared that, absent express protections, "Congress may grant monopolies in trade and commerce." 1 Debates on the Adoption of the Federal Constitution 496 (Jonathan Elliot, ed. 1866). *See generally* Conant, *supra*, at 801. In his writings to Thomas Jefferson about the Bill of Rights, James Madison noted that monopolies "are justly classed among the greatest nuisances in government." *Letter from James Madison to Thomas Jefferson* (Oct. 17, 1788), *in* 14 The Papers of Thomas Jefferson 21 (Princeton 1958). And Jefferson agreed. In his public and private writings, Jefferson "attach[ed] as much importance to the English constitutional immunity from grants of monopoly as he did those privileges and immunities which eventually appeared in the First Amendment." Conant, *supra*, at 800. *See also id.* at 799–800 (same).

Similar sentiments were expressed in the years leading up to the Civil War and the Reconstruction Amendments. In his debates with Stephen Douglas, Abraham Lincoln emphasized the fundamental importance of the right to exercise one's labors: "In the right to eat bread, without leave of anybody else, which his own hand earns, *he is my equal and the equal of Judge Douglas, and the equal of every living man*." *The Ottawa Debate*, *in* The Complete Lincoln-Douglas Debates of 1858 117 (Angle ed., 1991). Representative John Bingham, one of the primary drafters of the Fourteenth Amendment, later explained that "our own American constitutional liberty . . . is the liberty . . . to work an honest calling and contribute by your toil in some sort to the support of yourself, to the support of your fellowmen, and to be secure in the enjoyment of the fruits of your toil." Cong. Globe, 42nd Cong., 1st Sess. App. 86 (1871) (statement of Rep. Bingham). The Supreme Court echoed these sentiments, observing that

"[t]he right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich*, 239 U.S. 33, 41 (1915). *See also Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (recognizing the right "to engage in any of the common occupations of life").

\* \* \*

The First Amendment guarantees the freedom of speech and religion. But the meaningful exercise of those freedoms often requires the expenditure of resources. The Fourth Amendment secures the people in their houses, papers, and effects, and the Fifth Amendment protects property from taking without just compensation. But it's virtually impossible for most citizens to obtain property without an income.

In short, the right to engage in productive labors is essential to ensuring the ability of the average American citizen to exercise most of their other rights. *Cf.* James W. Ely Jr., The Guardian of Every Other Right: A Constitutional History of Property Rights (2007).

So it's not surprising that various scholars have determined that the right to earn a living is deeply rooted in our Nation's history and tradition—and should thus be protected under our jurisprudence of unenumerated rights.

But that is for the Supreme Court to determine. *See, e.g.*, Pet. for Writ of Certiorari in *Tiwari v. Friedlander*, No. 22-42 (U.S.). In the meantime, governing precedent requires us to affirm. Accordingly, I concur.